**IN THE COURT OF APPEALS OF TENNESSEE,**
**AT NASHVILLE**

**FILED**

May 26, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

|   |   |   |
|---|---|---|
| **IN THE MATTER OF:** | ) | Davidson County Juvenile Court |
| **M.C.G.** | ) | No. 9719-32119 |
|   | ) |   |
|   | ) | C.A. No. 01A01-9809-JV-00461 |
|   | ) |   |

From the Juvenile Court of Davidson County at Nashville.
**Honorable Andrew J. Shookhoff, Judge**

**Kathleen G. Morris**, Nashville, Tennessee
Attorney for Petitioner/Appellant.

**Paul G. Summers**, Attorney General and Reporter
**Douglas Earl Dimond**, Assistant Attorney General
Attorneys for Respondent/Appellee.

OPINION FILED:

**AFFIRMED AND REMANDED**

**FARMER, J.**

**CRAWFORD, P.J., W.S.**: (Concurs)
**HIGHERS, J.**: (Concurs)

Christy Gower (Mother) appeals the trial court's judgment terminating her parental rights to her minor son, M.C.G. We affirm the trial court's judgment based on our conclusion that the record contains clear and convincing evidence to support the court's findings that the Mother had abandoned M.C.G. and that termination of the Mother's parental rights was in M.C.G.'s best interests.

M.C.G. was born in April 1996. In January 1997, when M.C.G. was less than one year old, the Mother was arrested for attempting to buy illegal drugs from an undercover police officer. Because M.C.G. was with the Mother at the time of her arrest, the Metro Police Department contacted the Department of Children's Services (DCS). DCS subsequently filed a petition in which it sought an adjudication that M.C.G. was a dependent and neglected child and asked that M.C.G. be placed in the custody of the Mother's brother and his wife. *See* T.C.A. § 37-1-102(b)(12) (1996). Pursuant to a subsequent settlement agreement reached by the parties, the trial court entered an order adjudicating M.C.G. to be a dependent and neglected child due primarily to the Mother's long-term addiction to Dilaudid. The trial court's order placed M.C.G. in the joint legal custody of (1) the Mother and (2) the Mother's brother and his wife, with the latter to have physical custody of M.C.G.

At a May 6, 1997, dispositional hearing, the trial court was informed that the Mother's brother and his wife had returned M.C.G. to the Mother's care several days previously. By this time, the Mother was participating in a methadone treatment program in Bowling Green, Kentucky, and she lived in a motel there. Based upon the evidence presented at the May 1997 hearing, which included the telephonic testimony of a counselor at the methadone treatment center in Bowling Green, the trial court entered an order placing M.C.G. in the legal custody of DCS. The trial court's order indicated that such custody would be "for a very short period of time" and that the court would review the matter "for possible return of custody to the mother on June 5, 1997."

After the May 1997 dispositional hearing, DCS employees did not have any contact with the Mother again until November 1997. At a hearing held December 9, 1997, the trial court was informed that the Mother had contacted Peggy Carter at DCS. The Mother had not asked to visit M.C.G., however, and had told Carter that "it would take her a while to get herself together." In its order entered after the hearing, the trial court changed the permanency goal for M.C.G. from the

concurrent goals of "return to parent" and "adoption" to the single goal of "adoption." By this time, M.C.G.'s father, the Mother's estranged husband, had surrendered his parental rights to M.C.G.

Although the permanency goal for M.C.G. had changed to adoption, DCS still prepared and discussed a plan of care with the Mother. During this discussion, which took place in either December 1997 or January 1998, DCS case manager Peggy Carter described to the Mother the tasks that would be expected of her. These tasks required the Mother to (1) complete treatment for her drug addiction, (2) remain drug free, (3) make contact with DCS and visit M.C.G. on a regular basis, (4) maintain a known address, and (5) obtain employment so that she could support M.C.G. Under this arrangement, the Mother was expected to call DCS at the beginning of each week if she wanted to schedule a visit with M.C.G. during that week.

On January 15, 1998, the Mother attended her first scheduled visit with M.C.G. During the visit, Peggy Carter asked the Mother to provide a urine sample for a drug screen, but the Mother claimed that she could not urinate because she had a bladder infection.

At a January 28, 1998, hearing attended by the Mother, Peggy Carter reported that DCS had prepared a petition to terminate the Mother's parental rights. The trial court set the appearance date for February 11, 1998, and indicated that the Mother's former attorney, Kathleen Morris, would be asked to represent the Mother.

On January 29, 1998, the Mother arrived at DCS at about 10:10 a.m. for her second scheduled visit with M.C.G. During this visit, Peggy Carter again asked the Mother to provide a urine sample for a drug screen. The Mother agreed but stated that she "couldn't go right now." When Carter checked with the Mother about one hour later, the Mother claimed that she "still couldn't go." About one and one-half hours after the Mother's arrival, Carter left the room for about fifteen minutes to discuss another case with a coworker. When Carter returned, the Mother informed her that she had gone to the bathroom while Carter was gone. The Mother never did provide the requested urine sample.

On February 11, 1998, DCS filed a petition to terminate the Mother's parental rights. As grounds for termination, DCS alleged (1) that the Mother had abandoned M.C.G. pursuant to

Tennessee Code Annotated sections 36-1-102(1)(A)(I) and (iv) by willfully failing to visit M.C.G. for more than four consecutive months and by failing to make any contribution toward M.C.G.'s support, (2) that, pursuant to section 36-1-113(g)(3)(A), M.C.G. had been removed from the Mother's home for more than six months and the conditions which led to his removal still persisted with little likelihood that they would be remedied at an early date, and (3) that the Mother substantially had failed to comply with the statement of responsibilities in the plan of care for M.C.G. *See* T.C.A. § 36-1-113(g)(2) (Supp. 1997).

After the termination petition was filed, the Mother began visiting M.C.G. on a more regular basis. The Mother visited with M.C.G. on February 19 and on March 2, 12, and 19, 1998. When the Mother arrived at DCS on March 26, 1998, however, she was informed by case manager Kelly Windsor that DCS was suspending the Mother's visitation with M.C.G. until after the termination hearing, which was scheduled for April 7, 1998.

On April 22, 1998, after the termination hearing had been continued, DCS filed a motion to suspend the Mother's visitation with M.C.G. pending the outcome of the termination of parental rights hearing. When the Mother opposed the motion, the trial court ordered DCS to supervise two visits between the Mother and M.C.G. in May 1998. The Mother missed the first May visit because she had difficulty finding the prearranged meeting place. On the second visit, the Mother was able to find M.C.G. and the DCS case manager assigned to supervise the visit. This would be the last visit between the Mother and M.C.G.

At trial in June 1998, Peggy Carter, the DCS case manager for M.C.G., testified that, when she asked the Mother why she did not visit M.C.G. between May 1997 and January 1998, the Mother responded by stating that she had been in jail and that she "had shit to do." The Mother also had not paid any support for M.C.G. since Carter assumed responsibility for M.C.G.'s case in June 1997. In Carter's opinion, the Mother had not complied with the plan of care. When the Mother first reappeared, she gave Carter an address on Due West Avenue. Two months before trial, the Mother provided Carter with a different address on Virginia Avenue. Carter testified that the mail she sent to both of these addresses was returned, but she acknowledged that the Mother appeared to be living at one of the addresses with an elderly man who provided the Mother with a place to live

in exchange for her housekeeping services. Carter took the position that the Mother had not completed treatment for her drug addiction and that the Mother had not visited M.C.G. with sufficient regularity to satisfy the plan of care's visitation requirement. Carter acknowledged that the Mother probably would be unable to obtain employment, inasmuch as she was disabled from injuries she received in a car accident.

The Mother's counselors at Volunteer Treatment Center in Chattanooga testified by telephone. These counselors indicated that methadone treatment was a lifelong process for most patients and that the Mother probably would remain on methadone for the rest of her life. The Mother's primary counselor, Shasta Lillard, testified that the Mother had not tested positive for any other drugs since Lillard started counseling her. Although Lillard agreed that the negative drug screens were very good signs, she expressed concern that the Mother was not consistent with her treatment and that, at times, the Mother even was hurting her own treatment. For example, the Mother admitted to Lillard that she was arrested for DUI in January 1998 after she overdosed on methadone "carry-outs" she had received from the Center. The Mother told Lillard that she "just wanted to check out" because she "couldn't deal with everything." The Mother also did not participate in any support groups, although the Center's staff encouraged patients to do so. The Mother often asked for special or additional "carry-outs." If the Mother's request was not granted, she responded by not returning to the clinic for a few days or by requesting a transfer to another clinic.

Counselor Lillian Lockhart met with the Mother a few times in Lillard's absence. Lockhart last saw the Mother approximately one month prior to trial. At that time, the Mother appeared to be intoxicated or high. Lockhart suspected that the Mother was using marijuana because the Center did not screen its patients for marijuana and because the Mother had told Lockhart about previous marijuana use. Lockhart conveyed this suspicion to the Mother, but the Mother insisted that she just "was tired." When Lockhart denied the Mother's request for more "carry-outs," the Mother became angry and asked to be transferred to another treatment facility in middle Tennessee.

When the Mother testified, she admitted that she did not visit M.C.G. from May 1997 until January 1998. The Mother also admitted that she had not paid any support for M.C.G. since

he was placed in DCS's custody. The Mother first claimed that she was sick with hepatitis for almost two months during that time period. She also testified that she moved to Chattanooga in May 1997 because she and her husband reconciled and decided to move. The Mother later testified, however, that she left the Nashville area in May 1997 because she learned of the existence of outstanding warrants for her arrest and she was afraid of experiencing methadone withdrawal in jail. The Mother ultimately was arrested on the outstanding warrants in October 1997, and she spent about six weeks in jail. When she was released in November 1997, she contacted DCS.

The Mother further admitted that she was arrested for DUI in January 1998 after overdosing on her methadone "carry-outs." The Mother spent one or two days in jail, during which time she tested positive for Valium. The Mother denied using marijuana in the past year. Although her driver's license had been revoked, the Mother continued to drive, and she drove to trial in a friend's car. The Mother testified that she did not recall canceling several visits with M.C.G. in February 1998, and she claimed that she visited with M.C.G. each week of that month. The Mother explained that she missed two days of the April 1998 hearing on DCS's motion to suspend visitation because she was hurt in a car accident and was mugged.

At the time of trial, the Mother lived on Virginia Avenue in east Nashville with a seventy-eight-year-old man named Olan Johns. The Mother served "more or less" as Johns' housekeeper in exchange for a place to live. Although the rental home in which Olan Johns lived was for sale, Johns testified that he did not believe that the house would sell because the owner was asking too much money for it. Johns agreed that the Mother could continue to live with him indefinitely, and he testified that M.C.G. could live there, too. The Mother received SSI payments of $496 per month. Her methadone treatments cost $85 per week. Nevertheless, the Mother believed that she could support M.C.G. because she knew that there were "agencies that [would] help people like [her]."

At the trial's conclusion, the trial court entered an order terminating the Mother's parental rights to M.C.G. The trial court first found, by clear and convincing evidence, the existence of all three bases for termination asserted in DCS's petition. The court then found, after considering the relevant factors, that termination of the Mother's parental rights was in M.C.G.'s best interests.

On appeal from the trial court's order terminating her parental rights, the Mother presents the following issues for this court's review:

I. Whether the Trial Court erred in finding that the Department of Children's Services proved by clear and convincing evidence the persistence of conditions which led to removal of [M.C.G.] or which would subject [M.C.G.] to further neglect with little likelihood of early remediation.

II. Whether the Trial Court erred in finding clear and convincing evidence that [the Mother] willfully abandoned [M.C.G.].

III. Whether the Trial Court erred in finding clear and convincing evidence that [the Mother] failed to follow the foster care plan of care.

IV. Assuming, arguendo, that the Trial Court properly found clear and convincing evidence of a violation of T.C.A. § 36-1-113(g)(3), or of a willful abandonment of [M.C.G.], or of failure to follow the foster care plan of care, whether the Trial Court erred in finding clear and convincing evidence that it is in [M.C.G.'s] best interest for [the Mother's] parental rights to be terminated.

We begin our analysis with the well-established premise that a parent has a fundamental right to the care, custody, and control of his or her child. *In re Shipley*, No. 03A01-9611-JV-00369, 1997 WL 596281, at *1 (Tenn. App. Sept. 29, 1997) (citing *Stanley v. Illinois*, 405 U.S. 645 (1972)). This right, however, is not absolute. A parent's right to the care, custody, and control of his or her child may be terminated if clear and convincing evidence justifies such termination under the applicable statute. *In re Shipley*, 1997 WL 596281, at *1 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)).

Tennessee's statute provides that a termination of parental rights may be based upon any of the following grounds:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care pursuant to the provisions of title 37, chapter 2, part 4;

(3)(A) The child has been removed from the home of the

parent or guardian by order of a court for a period of six (6) months and:

(I)     The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's return to the care of the parent(s) or guardian(s), still persist;

(ii)     There is little likelihood that these conditions will be remedied at an early date so that the child can be returned to the parent(s) or guardian(s) in the near future; and

(iii)     The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a stable and permanent home.

T.C.A. § 36-1-113(g) (Supp. 1997).

In reviewing termination decisions, this court has recognized that, under the foregoing statute, the existence of any one of these bases will support a termination of parental rights. *Department of Children's Servs. v. Darr*, No. 03A01-9706-JV-00213, 1998 WL 128874, at *3 (Tenn. App. Mar. 24, 1998); *Department of Human Servs. v. Manier*, No. 01A01-9703-JV-00116, 1997 WL 675209, at *5 (Tenn. App. Oct. 31, 1997), *perm. app. denied* (Tenn. Mar. 2, 1998). In the present case, therefore, we must affirm the trial court's judgment terminating the Mother's parental rights if the record contains clear and convincing evidence to support any one of the three bases found by the trial court. *DCS v. Darr*, 1998 WL 128874, at *3; *DHS v. Manier*, 1997 WL 675209, at *5; *see also In re Musick*, No. 03A01-9708-JV-00368, 1998 WL 136561, at *1 (Tenn. App. Mar. 27, 1998).

This court recently attempted to describe the clear and convincing evidence standard, explaining that

Although it does not require as much certainty as the "beyond a reasonable doubt" standard, the "clear and convincing evidence" standard is more exacting than the "preponderance of the evidence" standard. *O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn. App. 1995); *Brandon v. Wright*, 838 S.W.2d 532, 536 (Tenn. App. 1992). In order to be clear and convincing, evidence must eliminate any serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence. *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992); *O'Daniel v. Messier*, 905 S.W.2d at 188. Such evidence should produce in the fact-finder's mind a firm

belief or conviction as to the truth of the allegations sought to be established. *O'Daniel v. Messier*, 905 S.W.2d at 188; *Wiltcher v. Bradley*, 708 S.W.2d 407, 411 (Tenn. App. 1985). In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is "highly probable" as opposed to merely "more probable" than not. *Lettner v. Plummer*, 559 S.W.2d 785, 787 (Tenn. 1977); *Goldsmith v. Roberts*, 622 S.W.2d 438, 441 (Tenn. App. 1981); *Brandon v. Wright*, 838 S.W.2d at 536.

*Bingham v. Knipp*, No. 02A01-9803-CH-00083, 1999 WL 86985, at *3 (Tenn. App. Feb. 23, 1999).

After carefully reviewing the evidence presented in this case, we conclude that clear and convincing evidence supports the trial court's termination of the Mother's parental rights based upon the court's finding that the Mother had abandoned M.C.G. As one of the bases for termination, DCS's petition asserted the ground of abandonment as that term is defined in Tennessee Code Annotated sections 36-1-102(1)(A)(i) and (iv). The cited code sections contain the following definitions of abandonment:

> (1)(A) "Abandonment" means, for purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, that:
>
> (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or make reasonable payments toward the support of the child;
>
> . . . .
>
> (iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration which exhibits a wanton disregard for the welfare of the child.

T.C.A. § 36-1-102(1)(A) (1996). The legislature has defined "willfully failed to visit" as meaning "the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token

visitation." T.C.A. § 36-1-102(1)(E) (1996).

In the present case, the evidence was undisputed that the Mother visited M.C.G. only two times in the nine-month period immediately preceding the filing of the termination petition. Although the Mother contacted DCS in November 1997, she did not attempt to schedule visitation with M.C.G. until January 1998. Prior to the filing of the termination petition on February 11, 1998, the Mother scheduled visits with M.C.G. on January 15, 1998, and again on January 29, 1998. Thus, even when she began visiting with M.C.G., the Mother scheduled visits during only two of the four possible weeks in which she could have scheduled visitation prior to the filing of the petition.[1] Under the circumstances of this case, we conclude that these visits merely constituted "token visitation" on the Mother's part. *See* T.C.A. § 36-1-102(1)(C) (1996) (defining "token visitation" as "perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child"). Accordingly, we affirm the trial court's ruling that the Mother abandoned M.C.G. by willfully failing to visit him pursuant to section 36-1-102(1)(A)(i). *See In re Adoption of Kratochvil*, No. 03A01-9712-CH-00536, 1998 WL 681334, at **2-4 (Tenn. App. Oct. 2, 1998) (affirming trial court's order granting December 1996 petition to terminate father's parental rights based upon finding of abandonment where father visited child five times during month immediately preceding filing of petition but did not visit child at all during August, September, or October 1996), *perm. app. denied* (Tenn. Mar. 8, 1999).

On appeal, the Mother points out that she was incarcerated during a portion of the four-month period preceding the filing of the termination petition. The Mother claims that she left the Nashville area in May 1997, when she learned of the existence of outstanding warrants for her arrest, because she feared that she would experience methadone withdrawal in jail. The Mother also claims that, when she was released from jail in November 1997, DCS employees thwarted her efforts to visit M.C.G. We will address these contentions in reverse order.

As for the Mother's claim that DCS employees thwarted her efforts to visit M.C.G.

---

[1]We note that the Mother began visiting M.C.G. on a more regular basis after DCS filed its petition to terminate the Mother's parental rights. We also note, however, that the relevant statute specifically provides that a parent may not repent his or her abandonment by resuming visitation subsequent to the filing of a termination petition. *See* T.C.A. § 36-1-102(1)(F) (1996).

after her release from jail, we observe that this claim presented a credibility question which the trial court apparently determined adversely to the Mother. At trial, the Mother testified that, when she was released from jail in November 1997, she tried to call Eureva Elmore and Peggy Carter at DCS. The Mother complained that no one called her back, so she asked a friend, James West, "to see what he could do." After West tried to call DCS "for a couple of days, finally, somebody called him back, a supervisor or somebody."

In contrast, DCS case manager Peggy Carter testified that it was she, and not the Mother, who initiated contact with the other party. After receiving the case file in June 1997, Carter made attempts to locate the Mother. Carter's efforts did not succeed until late November 1997. On November 21, 1997, Carter spoke with the Mother's sister-in-law, who provided Carter with James West's phone number and suggested that Carter call West. Carter called West's phone number but did not get an answer. On November 24, 1997, the Mother called Carter at DCS, apparently in response to Carter's attempts to contact her.

As our supreme court has explained,

> Where the trial judge has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, on review considerable deference must still be accorded to those circumstances. *Humphrey v. David Witherspoon, Inc.*, 734 S.W.2d 315 (Tenn. 1987). Where the issue for decision depends on the determination of the credibility of witnesses, the trial court is the best judge of the credibility and its findings of credibility are entitled to great weight. This is true because the trial court alone has the opportunity to observe the appearance and the demeanor of the witnesses. *Royal Insurance Co. v. Alliance Insurance Co.*, 690 S.W.2d 541, 543 (Tenn. App. 1985).

*Tenn-Tex Properties v. Brownell-Electro, Inc.*, 778 S.W.2d 423, 425-26 (Tenn. 1989).

In the present case, the trial court did not make a specific finding relative to the Mother's assertion that DCS employees thwarted her efforts to visit M.C.G. In announcing its decision at the trial's conclusion, however, the trial court specifically commented on the Mother's lack of candor in giving other testimony. Accordingly, we conclude that the trial court had ample justification to reject the Mother's testimony that DCS employees hindered her efforts to visit

M.C.G.

Moreover, we note that, at times, the Mother's own testimony belied her assertion that DCS employees thwarted her efforts to visit M.C.G. In her brief on appeal, the Mother asserts that, although she first met with Carter in December 1997, DCS refused to schedule a visit for her until January 15, 1998.[2] At trial, however, the Mother testified that she did not visit with M.C.G. in December 1997, not because she was thwarted from doing so, but because she "had to go see a medical doctor a couple of times" for her hepatitis.[3]

As for the Mother's assertion that she left the Nashville area in May 1997 because she feared that she would be arrested on outstanding warrants and would experience methadone withdrawal in jail, this court previously has rejected the argument that self-created legal problems can excuse a parent's failure to visit his or her child. In *In re Shipley*, No. 03A01-9611-JV-00369, 1997 WL 596281 (Tenn. App. Sept. 29, 1997), one of the father's asserted reasons for not visiting his four children was that he "was on the run" from law enforcement. This court explained that, even if true, this reason

> is a problem of his own making. As such, it can hardly serve as a
> legal basis for his failure to visit. He could have visited had he
> chosen to do so; he chose not to.

*In re Shipley*, 1997 WL 596281, at *4. We believe that this rationale applies equally to the facts of the present case.

Finally, we are cognizant of the fact that the Mother was in jail for a portion of the four-month period immediately preceding the filing of the termination petition. In such cases, the definition of abandonment set forth in section 36-1-102(1)(A)(iv) applies rather than the definition found in section 36-1-102(1)(A)(i). Even under this different standard, however, we still would

---

[2]The record citation provided by the Mother does not appear to support this assertion.

[3]Despite the Mother's testimony as to her continuing problems with hepatitis, we note that the Mother also testified that she never had taken any medication for her hepatitis because it was "not chronic."

affirm the trial court's finding of abandonment.

Under subsection (1)(A)(i), the critical time period for determining abandonment is the four-month period immediately preceding the filing of the termination petition. *See* T.C.A. § 36-1-102(1)(A)(i) (1996). In contrast, the critical time period for determining abandonment under subsection (1)(A)(iv) is the four-month period immediately preceding the parent's incarceration. *See* T.C.A. § 36-1-102(1)(A)(iv) (1996). In the present case, the Mother did not visit with M.C.G. at all between the May 1997 dispositional hearing and her October 1997 incarceration. Thus, regardless of which four-month period is examined in this case, the result is the same. During both of the critical time periods, the Mother willfully failed to visit M.C.G. as that phrase is defined in the statute. *See* T.C.A. §§ 36-1-102(1)(D), (E) (1996). Inasmuch as both subsections were cited in DCS's termination petition and in the trial court's final judgment, we adhere to our decision to affirm the trial court's finding of abandonment.

In light of our affirmance of the trial court's ruling on the issue of abandonment, we need not address the Mother's contention that the trial court also erred in terminating her parental rights based upon the court's findings that the Mother failed to substantially comply with the plan of care and that the conditions which led to M.C.G.'s removal still persisted with little likelihood that they would be remedied in the near future.

We find it necessary, however, to address the Mother's final issue whereby she contends that termination of her parental rights was not in M.C.G.'s best interests. In order to terminate a parent's rights to his or her child, the trial court must make two findings. The court first must find, by clear and convincing evidence, that one of the asserted grounds for termination has been established. T.C.A. § 36-1-113(c)(1) (Supp. 1997). Once the court has made this finding, the court additionally must find that termination of the parent's rights is in the child's best interests. T.C.A. § 36-1-113(c)(2) (Supp. 1997).

In making this best-interests determination, the trial court is required to consider, *inter alia*, the following factors:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward other children in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

T.C.A. § 36-1-113(h) (Supp. 1997).

In finding that termination of the Mother's parental rights was in M.C.G.'s best interests, the trial court specifically considered factors (1), (2), (3), (4), and (9). The trial court found that the Mother had failed to make such an adjustment of circumstances, conduct, or conditions as to make it in M.C.G.'s best interests to return to the Mother's home in the foreseeable future; that the Mother had failed to effect a lasting adjustment after reasonable efforts by available social services agencies; that the Mother had failed to maintain regular visitation or other contact with M.C.G.; that the Mother had failed to establish a meaningful relationship with M.C.G.; and that the Mother had failed to pay any portion of substitute physical care and maintenance for M.C.G.

Elsewhere in its judgment, the trial court made findings relative to factor (7). The court found that the Mother's long-term drug addiction and its associated medical and legal problems had caused the Mother to be absent for a majority of M.C.G.'s life. The court further found that these extended absences significantly damaged an already weakened relationship between the Mother and M.C.G.

We conclude that the evidence supports the trial court's findings. Although the Mother had made some progress in her treatment for drug addiction, the Mother's counselors testified that this progress was not consistent and that, at times, the Mother acted in such a way as to hurt her treatment. As recently as January 1998, the Mother had been arrested for DUI after overdosing on methadone and had tested positive for Valium while in jail. The counselors suspected, but had no proof, that the Mother still was using marijuana. The Mother failed to follow the counselors' recommendation that she participate in support groups. When the counselors denied her request for more "carry-outs," the Mother became angry and requested a transfer to another methadone clinic.

Moreover, as noted by the trial court, the Mother's drug addiction and resulting legal problems caused her to be absent during a large portion of M.C.G.'s life. The most recent absence, from May 1997 to January 1998, only could have weakened the already fragile relationship between the Mother and M.C.G. By the time the Mother reentered M.C.G.'s life in January 1998, M.C.G. knew his foster parents as "Mommy" and "Dad." When he arrived for scheduled visits with the Mother, M.C.G. invariably exhibited anxiety at being separated from his foster parents, but he rarely exhibited any distress at the end of these visits when he was required to leave the Mother.

Finally, it was undisputed that the Mother paid no portion of the support for M.C.G. after he was placed in DCS's custody.[4] In light of the foregoing evidence, we decline to disturb the trial court's finding that termination of the Mother's parental rights was in M.C.G.'s best interests.

The trial court's judgment is affirmed, and this cause is remanded for further

---

[4]A parent has the duty to support his or her child regardless of whether a court order exists requiring the parent to make child support payments. *See Department of Human Servs. v. Manier*, No. 01A01-9703-JV-00116, 1997 WL 675209, at *5 (Tenn. App. Oct. 31, 1997), *perm. app. denied* (Tenn. Mar. 2, 1998).

proceedings consistent with this opinion.  Costs of this appeal are taxed to the Mother, for which execution may issue if necessary.

 

 

 

                                      _____

                                      FARMER, J.

 

 

 

_____

CRAWFORD, P.J., W.S. (Concurs)

 

 

_____

HIGHERS, J. (Concurs)